**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RANGAN BANDYOPADHYAY, Derivatively on Behalf of RENT THE RUNWAY, INC., | Case No. 1:24-cv-7321 |
| Plaintiff, | |
| v. | |
| JENNIFER Y. HYMAN, SCARLETT O'SULLIVAN, TIM BIXBY, JENNIFER FLEISS, SCOTT FRIEND, MELANIE HARRIS, BETH KAPLAN, DAN NOVA, GWYNETH PALTROW, CARLEY RONEY, DAN ROSENSWEIG, and MIKE ROTH, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| RENT THE RUNWAY, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Rangan Bandyopadhyay ("Plaintiff"), by and through the undersigned counsel, derivatively on behalf of and for the benefit of Nominal Defendant Rent the Runway, Inc. ("Rent the Runway," or the "Company"), submits this Verified Shareholder Derivative Complaint against Jennifer Y. Hyman ("Hyman"), Scarlett O'Sullivan ("O'Sullivan"), Tim Bixby ("Bixby"), Jennifer Fleiss ("Fleiss"), Scott Friend ("Friend"), Melanie Harris ("Harris"), Beth Kaplan ("Kaplan"), Dan Nova ("Nova"), Gwyneth Paltrow ("Paltrow"), Carley Roney ("Roney"), Dan Rosensweig ("Rosensweig"), and Mike Roth ("Roth") (the "Individual Defendants" and together with Rent the Runway, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations against the Individual Defendants are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, developed from the investigation and analysis by Plaintiff's counsel of (i) regulatory filings made by Rent the Runway with the U.S. Securities and Exchange Commission (the "SEC"); (ii) press releases, transcripts of earnings calls, and other public statements issued and disseminated by the Company; (iii) Rent the Runway's website and marketing materials; (iv) price and volume data for Rent the Runway's Class A common stock; (v) research reports from securities and financial analysts; (vi) news and media reports concerning Rent the Runway and other facts related to this action; (vii) court filings in the related securities class action lawsuit alleging violations of federal securities law based on similar facts and circumstances alleged herein, captioned *Sharma v. Rent the Runway, Inc., et al.*, Case No. 1:22-cv-06935-OEM-VMS (the "Securities Class Action"), pending in the United States District Court for the Eastern District of New York; and (viii) other publicly available materials and data. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action to remedy misconduct committed by Rent the Runway's current and/or former officers and directors based on misleading statements and omissions made in connection with Rent the Runway's October 2021 initial public offering ("IPO"), including issuing a false and misleading registration statement and prospectus, failing to correct the misleading statements and omissions contained therein, and additional misleading statements made subsequent to the IPO.

2.    Rent the Runway, founded in 2008, pioneered the concept of online clothing rentals, which the Company refers to as its "Closet in the Cloud." According to Rent the Runway, "the Closet in the Cloud is the world's first and largest shared designer closet that has transformed the way that women get dressed by letting them wear whatever they want without having to own it. Our mission is to empower women to feel their best every day and to encourage millions of customers to buy fewer clothes and use our shared closet instead." Through their online platform, Rent the Runway's customers can rent clothing using either a subscription or on a one-off basis.

3.    In 2020, the COVID-19 pandemic and banning of in-person events throughout the country wiped out major demand for Rent the Runway's service, which relied significantly on its customers renting clothing for social and business events.

4.    During the COVID-19 pandemic, Rent the Runway lost almost two-thirds of its subscribers, decimating its revenue stream.

5.    As a result of COVID-19's impact on the Company, Rent the Runway was required to take out a loan secured on substantially all its assets. As the pandemic continued in 2020, the Company depleted its loan.

6.    Rent the Runway admitted to investors that 2020 was a challenging year for the

Company. But the Offering Documents (defined below) in connection with Rent the Runway's October 2021 IPO painted a starkly different picture.

7.       In a cover letter contained in the Offering Documents, Defendant Hyman — Rent the Runway's co-founder, Chief Executive Officer ("CEO"), and chair of the Company's Board of Directors (the "Board") — told investors that the Company had entered 2020 with "momentum behind us, poised for continued growth" and that since then, Rent the Runway had "emerged" from the pandemic "stronger as a result of our agility and resilience." The Offering Documents further stated that Rent the Runway "*continue[d] to experience strong momentum* in the third quarter of fiscal year 2021" and that the "spread of COVID-19 Delta variant and the trend of continued work from home … *had minimal impact* on our business or financial performance as of the date of [the Offering Documents]."

8.       Unfortunately for investors, Rent the Runway's reality was materially different than that represented in the Offering Documents.

9.       At the time of the IPO, despite shipping and receiving clothing being one of the Company's largest expenses and its timely and efficient execution critical to the Company's success, Rent the Runway was facing runaway shipping costs which rendered its fulfillment business strategy utterly unsustainable.

10.      Specifically, Rent the Runway used UPS as its primary shipping vendor. When UPS became cost prohibitive in 2019, a decision was made to switch to FedEx.  However, FedEx proved to be unreliable with many customers reporting negative feedback or cancelling their subscriptions when they did not receive their items on time. One year after switching from UPS to FedEx, FedEx significantly increased its prices. Immediately prior to the IPO, Rent the Runway was forced to switch back to the already expensive UPS for shipping.

11.     Secondly, at the time of the IPO, Rent the Runway was faced with materially increasing theft of its rented products. While theft of merchandise had always been a "huge issue" at Rent the Runway, customer theft became an even larger issue in 2021, which led to the loss of millions of dollars in revenue. The trend of increasing thefts was due in part to the Company's introduction of return drop boxes intended to decrease shipping expenses.

12.     As a result of these undisclosed adverse events, trends, uncertainties, and materialized risks, the money raised during the IPO was only able to sustain the Company for so long before it too was depleted, leaving the Company in a dire situation.

13.     In September 2022, just one year after the IPO, Rent the Runway announced a major restructuring plan, which included firing approximately 24% of the Company's corporate employees in an effort to save approximately $25 to $27 million in 2023.

14.     As a result of these undisclosed, adverse facts, Rent the Runway's stock plummeted, falling from its offering price of $21.00 per share to close at $1.58 on November 14, 2022.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1).

16.     Plaintiff's claims also raise a federal question concerning the claims in the Securities Class Action based on violations of the Securities Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of

the United States that it would not otherwise have.

19.    Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b), (c), and (d) because the alleged misstatements and wrongs complained of herein entered this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

20.    Plaintiff is a current shareholder of Rent the Runway. Plaintiff has continuously held Rent the Runway common stock at all relevant times.

21.    Nominal Defendant Rent the Runway is incorporated under the laws of Delaware with its principal executive offices located at 10 Jay Street, Brooklyn, New York. Rent the Runway's Class A common stock trades on the Nasdaq under the symbol "RENT." Rent the Runway is a defendant in the Securities Class Action.

22.    Defendant Hyman is Rent the Runway's co-founder. Since March 2009, Hyman has been the Company's CEO and the Chair of the Board. According to the Company's public filings, in 2023, Defendant Hyman received $6,047,552 in total compensation from the Company. Leading up to the IPO, Defendant Hyman, together with Defendant Fleiss, had controlling ownership of Rent the Runway's Class B common stock, beneficially owning 3,127,989 shares, or 63.8%, of the Company's Class B common stock.[1]  Defendant Hyman is a defendant in the Securities Class Action.

23.    Defendant Bixby has served as a director on the Board since February 2021. Defendant Bixby is also Chair of the Board's Audit Committee. According to the Company's public filings, in 2023, Defendant Bixby received $116,966 in total compensation from the

---

[1] Each share of Class B common stock is entitled to 20 votes per share and is convertible into one share of Class A common stock at any time.

Company. According to the Offering Documents, the Board had determined that Defendant Bixby was an "audit committee financial expert" within the meaning of SEC regulations. Defendant Bixby is a defendant in the Securities Class Action.

24.     Defendant Fleiss is Rent the Runway's co-founder and has served as a director on the Board since March 2009. Defendant Fleiss is also the Chair of the Nominating and Environmental, Social, and Governance ("ESG") Committee and served as Rent the Runway's Head of Logistics and Business Development from November 2008 through March 2017. According to the Company's public filings, in 2023, Defendant Fleiss received $96,966 in total compensation from the Company. Leading up to the IPO, Defendant Fleiss, together with Defendant Hyman, had controlling ownership of Rent the Runway's Class B common stock. Defendant Fleiss is a defendant in the Securities Class Action.

25.     Defendant Friend has served as a director on the Board since July 2009 and as the Lead Independent Director since October 2021. Defendant Friend is also a member of the Board's Compensation Committee. At the time of the IPO, Defendant Friend was a partner at Bain Capital Ventures, which beneficially owned 8,176,418 shares of Rent the Runway's Class A common stock. Entities affiliated with Bain Capital Ventures also owned 550,469 shares of the Company's Series E redeemable preferred stock (purchase price of $21.7560 per share), 558,074 shares of the Company's Series F redeemable preferred stock (purchase price of $22.3537 per share), and 135,406 shares of the Company's Series G redeemable preferred stock (purchase price of $14.74096). Defendant Friend is a defendant in the Securities Class Action.

26.     Defendant Harris has served as a director on the Board since July 2021. Defendant Harris is also a member of the Board's Audit Committee. According to the Company's public filings, in 2023, Defendant Harris received $96,966 in total compensation from the Company.

Defendant Harris is a defendant in the Securities Class Action.

27.     Defendant Kaplan has served as a director on the Board since February 2014. Defendant Kaplan is also the Chair of the Board's Compensation Committee and a member of the Board's Audit Committee. Defendant Kaplan served as Rent the Runway's President and Chief Operating Officer ("COO") from September 2012 through September 2015. According to the Company's public filings, in 2023, Defendant Kaplan received $137,769 in total compensation from the Company. Defendant Kaplan beneficially owned 885,910 shares of the Company's Class A common stock at the time of the IPO. Defendant Harris is a defendant in the Securities Class Action.

28.     Defendant Paltrow has served as a director on the Board since May 2021. Defendant Paltrow is also a member of the Board's Nominating and ESG Committee. According to the Company's public filings, in 2023, Defendant Paltrow received $96,966 in total compensation from the Company. Defendant Paltrow is a defendant in the Securities Class Action.

29.     Defendant Roth has served as a director on the Board since November 2020. Defendant Roth also serves as a member of the Board's Compensation Committee. According to the Company's public filings, in 2023, Defendant Roth received $96,966 in total compensation from the Company. Defendant Roth beneficially owned 67,838 shares of the Company's Class A common stock at the time of the IPO. Defendant Roth is a defendant in the Securities Class Action.

30.     Defendant O'Sullivan was Rent the Runway's Chief Financial Officer ("CFO") from September 2015 through the time of the IPO. According to the Company's public filings, in 2023, Defendant O'Sullivan received $3,073,633 in total compensation from the Company. At the time of the IPO, Defendant O'Sullivan beneficially owned 581,096 shares of the Company's Class A common stock. Defendant O'Sullivan is a defendant in the Securities Class Action.

31.     Defendant Nova was a director on the Board since February 2010. Defendant Nova was also a member of the Board's Audit Committee and Compensation Committee. At the time of the IPO, Defendant Nova was a General Partner at Highland Capital Partners; Defendant Nova and Highland Capital Partners beneficially owned 5,104,393 shares of the Company's Class A common stock. Entities affiliated with Highland Capital Partners also owned 174,430 shares of the Company's Series E redeemable preferred stock (purchase price of $21.7560 per share), 89,471 shares of the Company's Series F redeemable preferred stock (purchase price of $22.3537 per share), and 915,816 shares of the Company's Series G redeemable preferred stock (purchase price of $14.74096). Defendant Nova is a defendant in the Securities Class Action.

32.     Defendant Roney was a director on the Board since May 2011. Defendant Roney was also a member of the Board's Nominating and ESG Committee. According to the Company's public filings, in 2023, Defendant Roney received $102,600 in total compensation from the Company. Defendant Roney beneficially owned 37,812 shares of the Company's Class A common stock at the time of the IPO. Defendant Roney is a defendant in the Securities Class Action.

33.     Defendant Rosensweig was a director on the Board since November 2012. Defendant Rosensweig was also the Chair of the Board's Nominating and ESG Committee and a member of the  Compensation Committee. According to the Company's public filings, in 2023, Defendant Rosensweig received $79,641 in total compensation from the Company. Defendant Rosensweig beneficially owned 51,911 shares of the Company's Class A common stock at the time of the IPO. Defendant Rosensweig is a defendant in the Securities Class Action.

## SUBSTANTIVE ALLEGATIONS

34.     To facilitate consumers' access to its digital closet, Rent the Runway uses an online portal, which it describes as a "proprietary operating system for the sharing economy of

physical goods." Through this platform, consumers can choose from over 750 designer clothing brands and 18,000 clothing styles.

35.     Rent the Runway also markets itself as a data driven technology company and proudly touts that it captures "a vast amount of unique, actionable data on our customers and products."

36.     Rent the Runway's ability to rent the same piece of clothing to multiple customers enables it to offer access to its service at a price affordable to most consumers.

37.     Rent the Runway offers a subscription plan whereby a customer can sign up for a recurring monthly subscription that allows them to order a certain number of items at a fixed price. As of the time of the IPO, Rent the Runway offered subscription plans allowing customers to rent 4, 8, 12, or 16 items per month.

38.     Rent the Runway also allows customers to make one-time rentals through its "reserve" offering. The reserve offering consists of a-la-carte rentals, typically used for special occasions, which can be booked up to 4 months in advance. Customers, who include subscribers, have the option to rent items for four or eight days at rental rates ranging from $5 to $525 per item. Reserve customers receive one primary item and can select a complimentary backup size, as well as a backup style, at a discounted price.

39.     Rent the Runway also sells its clothing through its resale offering. Through the resale option, subscribers and customers can purchase pre-worn items from the Company's digital closet without having to sign up for a subscription or return the item to Rent the Runway.

40.     While reserve and resale contribute to the Company's bottom line, subscriptions account for most of the Company's revenue, bringing in approximately 80 percent of the Company's revenue.

41.     Indeed, the Company primarily sees its reserve and resale offerings as a way of converting new customers into subscribers. As Rent the Runaway explained in the Offering Documents: "We attract new subscribers directly into our Subscription offering, and through conversions of customers into subscribers from our Reserve and Resale offerings. Reserve has historically been a productive funnel into our Subscription offering, and we believe our Resale offering could provide a similar opportunity to drive acquisition into our Subscription offering."

42.     The value proposition for customers is clear: by renting clothing instead of buying, customers can wear many pieces of clothing they may not otherwise be able to afford. According to the Offering Documents, the average subscriber gets to wear clothes worth more than twenty times the cost of a monthly subscription on an annualized basis, i.e., more than $37,000 in designer retail value annualized for the first six months of fiscal year 2021.

43.     Although the Company has never been profitable and has operated at a net loss since its inception, Defendant Hyman told investors though a letter included in the Offering Document that it *"entered 2020 with momentum behind [it], poised for continued growth."*

44.     In early 2020, nearly every state in the United States issued lockdown or shelter-in-place orders requiring most people to stay in their homes and requiring non-essential businesses to close in order to mitigate the spread of COVID-19 virus. Social gatherings were rapidly cancelled as people isolated to mitigate the spread of the virus.

45.     Undeniably, fiscal year 2020 was challenging for the Company and the Offering Documents disclosed as much. Nevertheless, when the IPO occurred in October 2021, the Offering Documents told investors Rent the Runaway emerged from the pandemic "stronger as a result of [its] agility and resilience during the pandemic." According to the Offering Documents, Rent the Runway *"continue[d] to experience strong momentum* in the third quarter of fiscal year 2021."

The Offering Documents further represented that the "spread of COVID-19 Delta variant and the trend of continued work from home … ***had minimal impact*** on our business or financial performance as of the date of [the Offering Documents."

46.    In reality, as a result of the difficulties posed by the COVID-19 pandemic, Rent the Runway experienced substantial cost increases because of unsustainable fulfillment and shipping business strategies and increasing theft.

**A.    Rent the Runway's IPO**

47.    On or about October 27, 2021, Defendants conducted Rent the Runway's IPO, in which the Defendants sold 19,550,000 shares of Class A common stock to the public.

48.    As a result of the shares of Class A common stock offered in the IPO, Rent the Runway received $377.3 million after deducting expenses and underwriting discounts and commissions.

49.    The IPO was conducted pursuant to, and the sale of Rent the Runway stock was solicited by, several documents filed by Defendants with the SEC and disseminated by Defendants to the investing public, including: (i) a registration statement on Form S-1, which was declared effective by the SEC on October 26, 2021, following amendment (the "Registration Statement") and (ii) the final prospectus on Form 424(b)(4), dated October 26, 2021, which forms part of the Registration Statement (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

50.    The Prospectus stated that it was "an offer to sell" Rent the Runway's Class A common stock.

51.    The Offering Documents stated that "[n]either [Rent the Runway] nor any of the underwriters have authorized anyone to provide any information or to make any representations

other than those contained in this [P]rospectus or in any related free writing prospectuses [Rent the Runway] ha[s] prepared."

52.    Each of the Individual Defendants signed the Registration Statement.

53.    Each of the Individual Defendants participated in the preparation of the Offering Documents and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein.  In particular, the Individual Defendants each reviewed, edited, and approved the Offering Documents, participated in the IPO, and solicited the purchase of Rent the Runway's Class A common stock in the IPO to serve their financial interest and those of Rent the Runway.

54.    The Individual Defendants conducted a roadshow for the IPO to solicit the purchase of Rent the Runway's Class A common stock.  The Individual Defendants each also reviewed, approved, and delivered to investors the IPO's roadshow presentation, talking points, and script.

**B.    The Offering Documents Contained Materially False and Misleading Statements of Fact and Omitted Material Information**

55.    The Offering Documents were negligently prepared, and as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing its preparation.

56.    Section 11 creates liability against each of the Defendants for each misstatement, omission in contravention of an affirmative legal disclosure obligation, and omission of information that is necessary to prevent existing disclosures from being misleading, contained in the Offering Documents.

1.    ***The Offering Documents Contained Misstatements and Omissions About Rent the Runway's Shipping Costs and Falsely Described Certain Risks as Potential when Such Risks had Already Manifested or Would Foreseeably Occur Shortly After the IPO***

57.    One of the largest costs incurred by Rent the Runway preceding the IPO was transportation and shipping.

58.    As an e-commerce platform that depended on quickly and efficiently shipping its clothing to customers, Rent the Runway was highly dependent on shipping, and, as a result, at the mercy of transportation costs.

59.    The Offering Documents told investors that "[a] substantial majority of [its] inbound shipments from customers are currently returned through a single vendor" and that the Company was "currently in the process of transitioning" shipping vendors. The Offering Documents claimed that Rent the Runway could not "predict how this transition may impact [the Company's] costs and [the Company's] customer sentiment and satisfaction." The Offering Documents stated, in pertinent part, as follows:

> We currently rely on several third-party national and regional shipping vendors for our outbound and inbound logistics. ***A substantial majority of our inbound shipments from customers are currently returned through a single vendor—we have from time to time transitioned, and are currently in the process of transitioning, inbound shipments from this vendor to multiple other vendors, and we cannot predict how this transition may impact our costs and our customer sentiment and satisfaction***.

60.    Rather than disclosing the actual events and trends or uncertainties that had already manifested, the Offering Documents inaccurately described certain risks associated with the shipping or transportation of its products as ***potential*** risks which *"may"* or *"could"* have an adverse effect on its business, financial condition, and results of operations. The Offering Documents stated, in pertinent part, that:

> ***Shipping and logistics are a critical part of our business and our supply chain***

*and any changes or interruptions in shipping or logistics operations could adversely affect our operating results*.

*       *       *

*[O]ur business relies on the successful management of reverse logistics needed to ingest*, clean, and restock returned items quickly and efficiently in order to offer them for rental or resale to other customers. *If we are not able to negotiate acceptable pricing and other terms with these vendors or they experience performance problems or other difficulties, our operating results and customers' experience could be negatively impacted*.

Our ability to receive inbound products efficiently and ship products to and from customers may be negatively affected by many events outside of our control including, inclement weather, public health crises such as the COVID-19 pandemic, governmental regulations, labor disputes and other factors. We are also subject to risks of damage or loss during delivery by our shipping vendors. If our customers do not receive their orders in good condition on time, they could become dissatisfied and cease using our services, which would adversely affect our business and operating results. Our shipping vendors have faced and may continue to face increased volumes which, in turn, could cause a decrease in their service levels or result in an increase of their prices. *Increases in shipping costs* or other significant shipping difficulties or disruptions or any failure by our brand partners or third-party carriers to deliver high-quality products to us or to our customers, as applicable, in a timely manner or to otherwise adequately serve our customers *could damage our reputation and brand and may substantially harm our business.*

61.    The statements in ¶59-60 were each inaccurate statements of material fact when made because while noting only the *potential* negative impacts on the Company's business, financial condition, and results of operations, the Offering Documents failed to disclose the significant, *then-existing* material events and adverse trends or uncertainties that Rent the Runway *had already been* facing at the time of the IPO.  In particular, the Offering Documents failed to disclose that prior to the IPO, Rent the Runway had switched from UPS to FedEx as its primary shipping vendor because UPS was too expensive to be sustainable but that just before the IPO, FedEx doubled its shipping rates for the Company and the Company was forced to switch back to the already prohibitively expensive UPS.

**2.**    ***The Offering Documents Contained Misstatements and Omissions About Thefts and Falsely Described Certain Risks as Potential when Such Risks had Already Manifested or Would Foreseeably Occur Shortly After the IPO***

62.    The Offering Documents told investors that Rent the Runway had "***implemented fraud prevention measures, such as detection tools to identify irregular or high risk customer order*** patterns***, to reduce the risk of fraud***."

63.    The statements in ¶62 were false and misleading statements of material fact when made because they failed to disclose material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO. Contrary to having "implemented fraud prevention measures … to reduce the risk of fraud," the Company did not have policies or procedures in place to prevent theft and no actions were taken against customers who stole rented merchandize aside from preventing those customers from placing new orders.

64.    At the time of the IPO, in an attempt to lower the Company's shipping expenses, Rent the Runway expanded the use of drop boxes throughout the country. However, the drop boxes facilitated the theft of rented merchandise, leading to a material increase in customer thefts at the time of the IPO and a loss of at least $6 million in revenue annually.

65.    Rather than disclosing the actual events and trends or uncertainties that had already manifested, the Offering Documents inaccurately described certain future risks associated with theft of products as ***potential*** risks which *"may"* or *"could"* have an adverse effect on its business, financial condition, and results of operations, The Offering Documents stated, in pertinent part, that:

> ***We may incur significant losses from fraud.***
>
> ***We have in the past incurred and may in the future incur losses from various types of fraud, including claims that a customer did not authorize a purchase, customers who have closed bank accounts or have insufficient funds to satisfy payments, customers who use stolen credit cards to make purchases, customers who fraudulently rented multiple products at once and customers who have failed***

***to return rentals.*** In addition to the direct costs of such losses, if the fraud is related to credit card transactions and becomes excessive, it could result in us paying higher fees or losing the right to accept credit cards for payment. In addition, under current credit card practices, we are typically liable for fraudulent credit card transactions….

However, ***our failure to adequately prevent fraudulent transactions could damage our reputation, result in litigation or regulatory action, and lead to expenses that could substantially impact our operating results***.

66.     The Offering Documents inaccurately described certain future risks associated with the use of drop boxes as ***potential*** risks which *"may"* or *"could"* have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

In addition to offering the ability to return products through our third-party shipping vendors, ***we offer multiple physical drop-off points for customers located in certain cities, including, for example, New York City, Boston, Nashville, Houston, and San Francisco to return their orders. In the event that we do not successfully manage these logistics, it will make it more difficult for us to maintain our products, and satisfy our customers which will negatively affect our brand, financial condition and results of operations.***

67.     The Offering Documents also inaccurately described certain future risks associated with insurance coverage failing to cover incidents of fraud as ***potential*** risks**,** which *"may"* or *"could"* have an adverse effect on its business, financial condition, and results of operations rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

***If our insurance coverage is insufficient for the needs of our business or our insurance providers are unable to meet their obligations, we may not be able to mitigate the risks facing our business.***

***We procure third-party insurance policies to cover various operations-related risks including*** employment practices liability, workers' compensation, ***property*** and business interruptions, cybersecurity and data security incidents, ***crime***, directors' and officers' liability, and ***general business liabilities***. We cannot

guarantee that we will continue to receive adequate insurance coverage on favorable terms. Insurance providers may discontinue their coverage or significantly increase the cost of coverage, and we cannot guarantee that we would be able to secure replacement coverage on reasonable terms or at all. In addition, if our insurance carriers change the terms of our policies in a manner not favorable to us, our insurance costs could increase. *Further, if the insurance coverage we maintain is not adequate to cover losses that occur*, or if we are required to purchase additional insurance for other aspects of our business, *we could be liable for significant additional costs*. Additionally, if any of our insurance providers becomes insolvent, it would be unable to pay any operations- related claims that we make.

Insurance providers have also raised premiums and deductibles for many businesses, including ours, and may do so in the future. As a result, our insurance and claims expense could increase, or we may decide to raise our deductibles or self-insured retentions when our policies are renewed or replaced. *Our business, financial condition, and results of operations could be adversely affected if the cost per claim, premiums, the severity of claims, or the number of claims significantly exceeds our historical experience and coverage limits; we experience a claim in excess of our coverage limits; our insurance providers fail to pay on our insurance claims; we experience a claim for which coverage is not provided; or the number of claims under our deductibles or self-insured retentions differs from historical averages*.

68.    The statements in ¶¶65-67 were each inaccurate statements of material fact when made because while noting only the *potential* negative impacts on the Company's business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, *then-existing* material events and adverse trends or uncertainties that Rent the Runway *had already been* facing at the time of the IPO, such as the realities that: (i) thefts were materially increasing and leading to a loss of at least $6 million in revenue annually; (ii) in an attempt to lower the Company's shipping expenses, the Company expanded the use of return drop boxes throughout the country, however, the drop boxes backfired by facilitating the theft of rented merchandise; (iii) although Rent the Runway maintained a fraud processing program, the Company did not have policies or procedures in place to prevent fraud and no actions were taken against customers who stole rented merchandize aside from preventing those customers from

placing new orders; and (iv) Rent the Runway was only able to obtain successful insurance claims on approximately 35% of "lost" packages and insurance claims were capped at $100 plus shipping costs.

### C.    **Post-IPO Events**

69.    On December 8, 2021, Rent the Runway issued a press release reporting its third quarter 2021 financial results and disclosing a net loss of $87.8 million in, a $43.5 million decrease when compared to the same quarter a year prior (during the height of the COVID-19 pandemic).

70.    According to the December 2021 press release, fulfillment expenses, which include shipping costs, increased to $19.2 million for the third quarter 2021.

71.    In contrast to the fulfillment expenses reported in the December 2021 press release, the Offering Documents had reported $13.5 million in fulfillment expenses for the second quarter 2021; $8.8 million for the first quarter of 2021; $9.2 million for the fourth quarter of 2020; and $11.0 million for the third quarter of 2020.

72.    During an earnings call to discuss the quarterly results on December 8, 2021, Defendant Hyman explained that the Company was able to raise $357 million in its IPO, "a portion" of which was used to pay off approximately one third of the Company's substantial debt.

73.    Defendant O'Sullivan, on the December 8, 2021 earnings call, spoke about the impact of the rising transportation costs on the Company's profitability, explaining that the rising costs were something that the Company had "anticipated" during the IPO: "As we had anticipated, like many companies, we started to see transportation headwinds during Q3 with price increases from national carriers, and we expect to see the full impact of these headwinds in Q4 and fiscal '22." Defendant O'Sullivan further explained that "[w]e have implemented several strategies to mitigate rising transportation costs. The first is reducing our dependence on national carriers and

moving towards regional carriers, local couriers and consolidation play."

74.    On this news, the Company's stock price fell $0.50 per share, or 4.35% to close at $11 on December 9, 2021.

75.    On April 13, 2022, Rent the Runway issued a press release reporting the Company's fourth quarter 2021 and full fiscal year 2021 financial results. In the April 2022 press release, Rent the Runway reported a net loss of $211.8 million, an approximately $40 million greater loss than the same quarter a year prior.

76.    According to the April 2022 press release, fulfillment expenses, which include shipping costs, increased to $20.4 million for the fourth quarter 2021.

77.    During an earnings call to discuss the quarterly and annual results on April 13, 2022, Defendant Hyman downplayed the Company's miss in its guidance for subscriber figures, stating the Company's path toward profitability was "focused on a lot more than subscriber growth. We believe that these other initiatives will get us to our goals faster and can lead to even more attractive long-term margins." Defendant O'Sullivan, however, pivoted from the sentiment, acknowledging that "[w]e are focused on growing revenue by growing subscribers[.]"

78.    On June 9, 2022, Rent the Runway issued a press release reporting the Company's first quarter 2022 financial results. In the June 2022 press release, Rent the Runway reported a net loss of $42.5 million and reported 134,998 ending active subscribers.

79.    According to the June 2022 press release, fulfillment expenses, which include shipping costs, increased to $22.9 million for the first quarter 2022.

80.    On this news, the Company's stock price fell $.11 per share, or 3.14% to close at $3.39 on June 10, 2022.

81.    On September 12, 2022, Rent the Runway issued a press release announcing the

Company's second quarter 2022 financial results, reporting a net loss of $33.9 million.

82.    According to the September 2022 press release, fulfillment expenses, which include shipping costs, increased to $23.4 million for the second quarter 2022.

83.    Significantly, the September 2022 press release announced a massive restructuring plan intended to "streamline its organizational structure and drive operational efficiencies." The press release explained that "[t]he plan primarily includes total workforce reductions of approximately 24% of corporate employees (primarily a reduction in force, with some open role closures/reduced backfills), reorganizing certain functions and reallocating resources to continue to focus on customer experience and growth initiatives." The plan would purportedly save the company between $25 and $27 million in fiscal year 2023.

84.    On September 12, 2022, during an earnings call to discuss the quarterly results, Defendant Hyman explained the reasons for the restructuring plan, stating:

> ***Today, we announced a restructuring plan to reduce $25 million to $27 million of annual operating costs and streamlined our org structure. We made the difficult decision to reduce our corporate headcount by about 24%.*** The headcount measures will be largely complete in Q3, and we expect to realize savings beginning in Q3 and into fiscal 2023. We took a deep and rigorous look at our business, benchmarking ourselves to other companies and realize that we have the potential to improve efficiency and drive profitability sooner while continuing to grow revenue. ***Despite almost 45% incremental flow-through margins on additional revenue, growth in our relatively high fixed cost base prevented more rapid gains in profitability.*** We believe that our customers are best served by investments that focus on them and by simple and quicker decision-making.

85.    On this news, the Company's stock price fell $1.90 per share, or 38.77% to close at $3.00 on September 13, 2022.

## FIDUCIARY DUTIES OF INDIVIDUAL DEFENDATNS

86.    By reason of their positions as officers and directors of Rent the Runway, and because of their ability to control the business and corporate affairs of Rent the Runway, the

Individual Defendants owed Rent the Runway and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Rent the Runway in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Rent the Runway and its shareholders so as to benefit all shareholders equally.

87.     Each director and officer of the Company owes to Rent the Runway and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

88.     The Individual Defendants, because of their positions of control and authority as officer and directors of Rent the Runway, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

89.     To discharge their duties, the officers and directors of Rent the Runway were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

90.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Rent the Runway, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

91.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the New York Stock Exchange, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's supply chain issues resulting from regulations in the travel retail industry. The Individual Defendants also had a fiduciary duty to disclose the material information necessary to prevent other public statements, including those in its regulatory filings with the SEC, from being materially false, so that the market price of the Company's common stock was based upon truthful, accurate, and fairly presented information.

92.     To discharge their duties, the officers and directors of Rent the Runway were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Rent the Runway were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Rent the Runway's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Rent the Runway conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Rent the Runway and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Rent the Runway's operations would comply with all applicable laws and Rent the Runway's public statements, financial statements and regulatory filings were accurate;

(f)    adequately monitor the Company's officers and employees to ensure their public statements about the Company were complete and accurate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

93.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Rent the Runway.

94.    Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## THE CODE OF CONDUCT

95.     Rent the Runway maintains a Code of Conduct that "describe[s] the standards of conduct expected of everyone at [the Company]." The Code of Conduct explicitly states that it applies to "everyone at Rent the Runway throughout the world, regardless of position or tenure."

96.     In a section titled "Our Values in Action," the Code of Conduct states the following, in relevant part:

> We operate with honesty and integrity. We keep our commitments to each other and to members of our Community—that is, RENT THE RUNWAY employees, customers, partners, suppliers, investors and other stakeholders. We endeavor to communicate in an honest and unambiguous way, and avoid making misleading communications, or creating false impressions.

> \*      \*      \*

> We are responsible and law abiding. We follow the law. This includes international, national, and local laws, rules and regulations where we do business. We also report wrongdoing, if we encounter it, and follow the reporting procedures described later in this Code.

97.     In a section titled "Responsibilities to Rent the Runway," the Code of Conduct provides, in relevant part:

> We maintain accurate of complete business and financial records. We create and maintain financial records in accordance with applicable legal requirements and generally accepted accounting practices. Our SEC reports, disclosures, and other public communications must be full, fair, accurate, timely, and understandable. We are each responsible for Rent the Runway's financial integrity and fiscal responsibility. We acknowledge our responsibility to inform appropriate finance or legal personnel in a timely manner or anything that might have a material impact on our financial statements or disclosures.

## CORPORATE GOVERNANCE GUIDELINES

98.     Rent the Runway also maintains Corporate Governance Guidelines (the "Guidelines"). The purpose of the Guidelines is to "assist[] the Board in the exercise of its responsibilities and to serve the interests of the Company and its stockholders."

99.     In a section titled "Risk Management," the Guidelines provide the following

regarding the Board's role in oversight of risk management:

> The Board, as a whole and through its standing committees, is responsible for the oversight of the Company's risk management process, including risk identification and related policies and procedures. In particular, the Board shall:
>
> - receive quarterly management updates regarding risks relating to data privacy, technology and information security, including cyber security, and the steps the Company has taken to monitor and control such exposures; and
> - provide oversight assistance in connection with the Company's legal, regulatory and ethical compliance, including the procedures in place to enforce the Code of Conduct.
>
> Additionally, while each committee shall be responsible for evaluating certain risks and overseeing the management of such risks, the entire Board will be regularly informed through committee reports about such risks.

## THE AUDIT COMMITTEE CHARTER

100.     Rent the Runway maintains an Audit Committee Charter (the "Charter"), which states that the purpose of the Board's Audit Committee is to "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company."

101.     In a section titled "Duties and Responsibilities," the Charter provides the following, in relevant part:

*Financial Statements and Annual Audit*

1. *Audit Problems*. The Committee shall discuss with the independent auditor any audit problems or difficulties and management's response.

2. *Form 10-K Review*. The Committee shall review and discuss the annual audited financial statements and related disclosures as well as critical accounting policies with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

3. *Audit Committee Report*. The Committee shall provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

4. *Form 10-Q Review*. The Committee shall review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

1. *Review of Earnings Releases*.  The Committee shall review and discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

2. *Risk Assessment and Risk Management*.  The Committee shall oversee the management of risks associated with the Company's financial reporting, accounting, and auditing matters, including the Company's major financial risk exposures and the steps taken by management to identify, monitor and control these exposures.

3. *Internal Control Over Financial Reporting*. The Committee shall review the adequacy of the Company's internal control over financial reporting.

4. Hiring of Independent Auditor Employees.  The Committee will oversee any hiring policies, as may be required by applicable rules and regulations, governing how the Company may hire employees or former employees of the Company's independent auditor.

5. *Complaint Procedures*.  The Committee shall establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

6. *Review of Related Person Transactions*.  The Committee shall review all related person transactions (as defined by Item 404 of Regulation S-K) in accordance with the Company's Related Person Transaction Policy.

7. *Reports to the Board of Directors*.  The Committee shall report regularly to the Board regarding the activities of the Committee.

## DAMAGES TO THE COMPANY

102.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has expended and will continue to expend many millions of dollars.

103.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

104.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken

against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

105.    As a direct and proximate result of the Individual Defendants' conduct, the Company has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

106.    Plaintiff brings this action derivatively in the right and for the benefit of Rent the Runway to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties as directors and/or officers of Rent the Runway.

107.    The Company is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

108.    Plaintiff will adequately and fairly represent the interests of Rent the Runway and its stockholders in enforcing and prosecuting its rights.

109.    Plaintiff is a current shareholder of Rent the Runway and has been a continuous shareholder of the Company's common shares at all relevant times.

110.    At the time this action was commenced, the Board was comprised of the following eight individuals: Defendants Hyman, Bixby, Fleiss, Friend, Kaplan, Michael, Paltrow, and Roth (the "Director Defendants").

111.    A pre-suit demand on the Board is futile and, therefore, excused. Plaintiff is required to show that a majority of directors of the current Board cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an

independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would be a futile act.

112.    Additional reasons that demand on Defendant Hyman is futile follow. Defendant Hyman has served as the Company's CEO and Chair of the Board since 2009. The Company provides Defendant Hyman with her principal occupation, for which she receives significant compensation as detailed above. As the Company's co-founder, highest officer, and an influential member of the Board, Defendant Hyman was ultimately responsible for the issuance of all the false and misleading statements, including the false and misleading statements in the Offering Documents, which she signed. As a trusted Company director, Defendant Hyman conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor controls over reporting, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Hyman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Thus, demand upon Defendant Hyman is futile and, therefore, excused.

113.    Additional reasons that demand on Defendant Bixby is futile follow. Defendant Bixby has served as a company director since 2021. The Company provides Defendant Bixby with significant compensation as detailed above. Defendant Bixby authorized his signature on the Offering Documents, which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Bixby breached his fiduciary duties, faces a substantial likelihood of liability, is not

independent or disinterested. Thus, demand upon Defendant Bixby is futile and, therefore, excused.

114.     Additional reasons that demand on Defendant Fleiss is futile follow. Defendant Fleiss has served as a Company director since 2009. The Company provides Defendant Fleiss with significant compensation as detailed above. Defendant Fleiss authorized her signature on the Offering Documents, which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor controls over reporting, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Fleiss breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Thus, demand upon Defendant Fleiss is futile and, therefore, excused.

115.     Additional reasons that demand on Defendant Friend is futile follow. Defendant Friend has served as a Company director since 2009. Defendant Friend authorized his signature on the Offering Documents, which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Friend breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Thus, demand upon Defendant Friend is futile and, therefore, excused.

116.     Additional reasons that demand on Defendant Kaplan is futile follow. Defendant Kaplan has served as a Company director since 2014. The Company provides Defendant Kaplan with significant compensation as detailed above. Defendant Kaplan authorized her signature on

the Offering Documents, which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor controls over reporting, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Kaplan breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Thus, demand upon Defendant Kaplan is futile and, therefore, excused.

117.    Additional reasons that demand on Defendant Michael is futile follow. Defendant Michael has served as a Company director since 2023. The Company provides Defendant Michael with significant compensation as detailed above. Defendant Michael authorized his signature on the Offering Documents, which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Michael breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Thus, demand upon Defendant Michael is futile and, therefore, excused.

118.    Additional reasons that demand on Defendant Paltrow is futile follow. Defendant Paltrow has served as a Company director since 2021. The Company provides Defendant Paltrow with significant compensation as detailed above. Defendant Paltrow authorized her signature on the Offering Documents, which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor controls over

reporting, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Paltrow breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Thus, demand upon Defendant Paltrow is futile and, therefore, excused.

119.    Additional reasons that demand on Defendant Roth is futile follow. Defendant Roth has served as a Company director since 2020. The Company provides Defendant Roth with significant compensation as detailed above. Defendant Roth authorized his signature on the Offering Documents, which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Roth breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Thus, demand upon Defendant Roth is futile and, therefore, excused.

120.    Additional reasons that demand upon the Board is futile follow.

121.    Defendants Bixby, Kaplan, Harris, Nova, and Michael serve as members of the Audit Committee and/or served as members of the Audit Committee at the time of the IPO and, pursuant to the Audit Committee Charter, were specifically charged with, *inter alia*, the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. In connection with the IPO, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions. Therefore, Defendants Bixby, Kaplan, Harris, Nova, and Michael cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them

to substantial liability and threaten their livelihood.

122.    The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

123.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.

124.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Rent the Runway stock and stock options they held.

125.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Rent the Runway's standards of business conduct. The Director Defendants violated the

Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

126.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

127.     The acts complained of herein constitute violations of fiduciary duties owed by Rent the Runway's officers and directors, and these acts are incapable of ratification.

128.     The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Rent the Runway. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by Rent the Runway against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Rent the Runway, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot

be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

129.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Rent the Runway to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

130.    For all of the reasons set forth above, the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

131.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.    The Individual Defendants owed Rent the Runway fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

133.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

134.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and

procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.

135.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Rent the Runway's securities.

136.    These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

137.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

138.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock,

resulting in an increased cost of capital, and reputational harm. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SECOND CLAIM

**Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duties**

139.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

141.    Plaintiff on behalf of Rent the Runway has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Unjust Enrichment**

142.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Rent the Runway.

144.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Rent the Runway that was tied to the performance or artificially inflated valuation of Rent the Runway or received

compensation that was unjust in light of the Individual Defendants' bad faith conduct.

145.    Plaintiff, as a shareholder and a representative of Rent the Runway, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

146.    Plaintiff on behalf of Rent the Runway has no adequate remedy at law.

### FOURTH CLAIM

**Against the Individual Defendants for Waste of Corporate Assets**

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

149.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and colleting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

150.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

151.    Plaintiff on behalf Rent the Runway has no adequate remedy at law.

**FIFTH CLAIM**

**Against the Individual Defendants for Contribution and Indemnification Under Section 11(f) of the Securities Act**

152.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as fully set forth herein.

153.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Actions brought on behalf of Rent the Runway shareholders, in which the Company is a joint tortfeasor in claims brought under Section 11 of the Securities Act.

154.    Federal law provides Rent the Runway with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

155.    The plaintiffs in the Securities Class Actions allege that the Registration Statement contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing proper preparation.

156.    Rent the Runway is the registrant for the IPO. The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

157.    As issuer of the shares, Rent the Runway is strictly liable to the plaintiffs in the Securities Class Action and the class for the misstatements and omissions alleged in the Securities Class Action.

158.    The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of and material facts and were not misleading.

159.    The Individual Defendants, because of their positions of control and authority as officers and directors of Rent the Runway, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Rent the Runway, including the wrongful acts complained of herein and in the Securities Class Action.

160.    Accordingly, the Individual Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution.

161.    As such, Rent the Runway is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

F.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: October 18, 2024                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           /s/ Phillip Kim
                                           Phillip Kim, Esq.
                                           Laurence M. Rosen, Esq.
                                           275 Madison Avenue, 40th Floor
                                           New York, NY 10016
                                           Telephone: (212) 686-1060
                                           Facsimile: (212) 202-3827
                                           Email: philkim@rosenlegal.com
                                                  lrosen@rosenlegal.com

                                           *Counsel for Plaintiff*

## **VERIFICATION**

I, Rangan Bandyopadhyay am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

10/17/2024

*Rangan Bandyopadhyay*

DocuSigned by:
C39980F25D0949F...

Rangan Bandyopadhyay